Anne Johnson Palmer (CSB # 302235)
*anne.johnsonpalmer@ropesgray.com*
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, California 94111-4006
Tel.: (415) 315-6300
Fax: (415) 315-6350

John D. Donovan (*admitted pro hac vice*)
*john.donovan@ropesgray.com*
Robert A. Skinner (*admitted pro hac vice*)
*robert.skinner@ropesgray.com*
Amy D. Roy (*admitted pro hac vice*)
*amy.roy@ropesgray.com*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel.: (617) 951-7000
Fax: (617) 951-7050

Attorneys for Defendant
*T. ROWE PRICE ASSOCIATES, INC.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER ZOIDIS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> T. ROWE PRICE ASSOCIATES, INC., <br><br> Defendant. | Case No. 16-cv-02289-VC <br><br> **DEFENDANT T. ROWE PRICE ASSOCIATES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

**TO THE HONORABLE COURT AND ALL PARTIES AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on August 25, 2016, at 10:00 a.m., or as soon thereafter as the matter may be heard by the Honorable Vince Chhabria, presiding in Courtroom 4 of the United States District Court for the Northern District of California, located in the United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant T. Rowe Price Associates, Inc., will, and hereby does, move this Court to dismiss this case for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

1    This Motion is based on this Notice of Motion and Motion, and the accompanying

2    Memorandum of Points and Authorities, together with the supportive Declaration and exhibits

3    filed herewith, all records and papers on file in this action, and any evidence and/or oral argument

4    offered at any hearing on this Motion.

5

6    Dated: July 1, 2016                    Respectfully submitted,

7
      Robert A. Skinner
8     ROPES & GRAY LLP

9

10                                          By:    /s/ Robert A. Skinner
11                                                 Robert A. Skinner

12                                          Attorneys for Defendant
13                                          T. ROWE PRICE ASSOCIATES, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................ 2

    A.    Mutual Funds and the Investment Company Act of 1940 ...................... 2

    B.    TRP's Services and Fees ........................................................................ 3

    C.    Approval of IMAs and Fees by Statutorily Independent Directors ........ 5

ARGUMENT ........................................................................................................... 5

I.    THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER SECTION 36(b) OF THE ICA.................................................. 5

    A.    The Legal Standard for Pleading a Section 36(b) Claim Is Stringent ..................... 5

    B.    Plaintiffs' Conclusory and Unsupported Allegations Regarding TRP's Sub-Advisory Services Provide No Basis to Conclude that TRP's Advisory Fee to the Funds Could Not Have Been Negotiated at Arm's Length.............................. 7

    C.    Conclusory Allegations About Presumed Economies of Scale Do Not Plausibly Allege that the Fees Were Outside an Arm's-Length Bargaining Range.................................................................................... 12

    D.    Plaintiffs' Allegations Regarding Board Independence, Expertise, Care, and Conscientiousness Are Deficient and Contradicted by the Public Record ........... 14

II.    SECTION 47 PROVIDES NO SEPARATE BASIS FOR A CLAIM .............................. 15

CONCLUSION .......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006) ............................................................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 2, 6

*Burks v. Lasker*,
441 U.S. 471 (1979) ......................................................................................................... 2

*Davis v. Bailey*,
No. CIVA05-cv-0042 WYD-OES, 2005 WL 3527286 (D. Colo. Dec. 22, 2005) ................ 15

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) ......................................................................... 12, 13

*In re Am. Mut. Funds Fee Litig.*,
No. CV-04-5593-GAF-(RNBx), 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ................... 13

*In re Evangelist*,
760 F.2d 27 (1st Cir. 1985) ............................................................................................. 15

*In re Gartenberg*,
636 F.2d 16 (2d Cir. 1980) .............................................................................................. 15

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) .................................................................................. 12

*In re Scudder Mut. Funds Fee Litig.*,
No. 04 Civ.1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ............................. 12

*Ingenhutt v. State Farm Inv. Mgmt. Corp.*,
No. 1:15-cv-01303, slip op. (C.D. Ill. June 22, 2016) ......................................................... 6

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010) ................................................................................................. *passim*

*Jones v. Harris Assocs. L.P.*,
611 F. App'x 359 (7th Cir. 2015) ................................................................................ 1, 6, 7

*Kalish v. Franklin Advisers, Inc.*,
742 F. Supp. 1222 (S.D.N.Y. 1990) ............................................................................ 12, 13

*Kamen v. Kemper Fin. Servs., Inc.,*
   908 F.2d 1338 (7th Cir. 1990) ................................................................. 15

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
   77 F. Supp. 2d 559 (D.N.J. 1999) ........................................................... 14

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
   248 F.3d 321 (4th Cir. 2001)............................................................... 7, 14

*Turner v. Davis Selected Advisers, LP,*
   626 F. App'x 713 (9th Cir. 2015) ................................................... *passim*

*Turner v. Davis Selected Advisers, LP,*
   No. 08-cv-00421-TUC-AWT, 2011 WL 13070408 (D. Ariz. June 1, 2011) ............. 13, 14, 15

*Zehrer v. Harbor Capital Advisors, Inc.,*
   No. 14 C 789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ................................. 15

**STATUTES**

15 U.S.C. § 80a-10(a)-(b) ............................................................................ 2

15 U.S.C. § 80a-10(b)(1) ............................................................................ 5

15 U.S.C. § 80a-15(a)-(c) ............................................................................ 2

15 U.S.C. § 80a-15(c) .............................................................................. 2, 3

15 U.S.C. § 80a-35(b) ........................................................................ *passim*

15 U.S.C. § 80a-46(b)(1) .......................................................................... 15

17 C.F.R § 239.15A ................................................................................. 8

**OTHER AUTHORITIES**

Ninth Circuit Local Rule 36-3(b) .................................................................. 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs contend that T. Rowe Price Associates, Inc. ("TRP") breached its "fiduciary duty with respect to the receipt of compensation" under Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b), by charging eight mutual funds allegedly "excessive" investment management fees. As a matter of law, plaintiffs must allege and prove that TRP's charges are "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010). Under that standard, the court's job is not to "assess the fairness or reasonableness" of the challenged fees. *Jones v. Harris Assocs. L.P.*, 611 F. App'x. 359, 360 (7th Cir. 2015) (on remand from the Supreme Court). Rather, the "goal is to *identify the outer bounds* of arm's length bargaining," to see if the contested fees exceed them. *Id.* (emphasis added).

This Complaint does not begin to describe those "outer bounds" and accordingly cannot begin to claim that the challenged fees are past the permissible frontier. Instead, the pleading principally contends that the fees that TRP charges for retail mutual funds it sponsors compare unfavorably to the fees it charges twenty-four other mutual funds as their "sub-adviser." But the pleading's only basis for that comparison is the bald allegation – unadorned with factual specifics – that TRP performs "the same or substantially the same" services when acting in those two roles. Plaintiffs' say-so is the only support for that assertion. And that is insufficient. Their failure to show similarity in the services TRP performs in its separate roles as adviser and sub-adviser runs headlong into the Supreme Court's instruction in *Jones* that courts be "wary of inapt comparisons" by insisting upon a factual predicate for comparability. 559 U.S. at 350.

Worse, plaintiffs' comparison of advisory and sub-advisory fees deliberately omits to disclose the *complete* fees investors in the sub-advised funds pay. That omission both distorts the proffered comparison and reveals the Complaint's chosen contrast to be deceptive. The SEC-mandated disclosure that all these funds – advised and sub-advised alike – are obliged to make shows that nearly all of the TRP-advised funds incur *lower* aggregate management fees than the sub-advised funds pay their managers. Plaintiffs just subtract out the difference – without so

much as a hint at that calculation contrivance – to make up the claim that TRP's fees are wrongfully higher. Simply put, *ipse dixit* allegations and manufactured fee disclosures are not "plausible" predicates to establish a factual foundation for comparability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, the Ninth Circuit recently held as much, affirming the dismissal of a remarkably similar complaint because the plaintiff urged fee comparisons based on his own say-so, relying on contrasts between facially different funds. *Turner v. Davis Selected Advisers, LP*, 626 F. App'x 713, 717 (9th Cir. 2015). Dismissal was required because the plaintiff's allegations there were "grounded in inapt comparisons." *Id.*

So too here. The absence of particulars and the public record combine to reveal plaintiffs' inability to make out a case that TRP's fees exceed the fair bargaining range. Accordingly, the Complaint should be dismissed in its entirety.

## BACKGROUND

### A. Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle constituting "a pool of assets, consisting primarily of [a] portfolio [of] securities," that belongs to the individual investors owning shares in the fund. *Jones*, 559 U.S. at 338 (internal quotation marks and citation omitted). As a matter of industry practice, mutual funds' management and operations are typically externalized and contractually delegated to an investment adviser. *Burks v. Lasker*, 441 U.S. 471, 481 (1979). This structure separating a mutual fund and its adviser is enshrined in the ICA and reflects its principal purpose: to protect mutual fund investors by maintaining a fund's independence from its adviser. *See* 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c); *Burks*, 441 U.S. at 484-85.

The ICA's regulatory structure safeguards shareholder interests by exclusively empowering non-interested directors sitting on a mutual fund's board (the "independent directors") to act as a "watchdog" for the interests of fund shareholders and to ensure that any conflicts of interest between the fund and its adviser are identified and managed. *See* 15 U.S.C. § 80a-15(c); *Burks*, 441 U.S. at 484. Among other requirements, a majority of independent directors must approve the compensation a fund pays under its advisory agreement annually. 15 U.S.C. § 80a-15(c). To fulfill that obligation, the directors must "request and evaluate" – and the

investment adviser must provide – all information reasonably necessary to evaluate the terms of the advisory contract with the funds. *Id.*

### B.     TRP's Services and Fees

*Advisory Services and Fees.* TRP serves as investment adviser to the eight funds at issue in this action.[1] Pursuant to an Investment Management Agreement ("IMA") with each fund, TRP provides a wide array of services to the Funds, including (1) formulating and implementing a continuing investment program; (2) supervising and directing investments in accordance with the Funds' investment objectives; (3) making and executing investment decisions; (4) effecting all security transactions; (5) negotiating commissions and allocating principal business and portfolio brokerage; (6) monitoring market conditions; (7) providing regular reports to the Board; (8) managing risks that arise from the Funds' investments and operations; (9) furnishing reports and information requested by the Funds; (10) assisting the fund in developing all general shareholder communications, including shareholder reports; and (11) overseeing the administration of the Funds' general business and affairs. *E.g.*, Roy Decl.,[2] Ex. A (CAF IMA) at 1-2.[3] TRP also provides the Funds with various financial, accounting, and administrative services, including (1) "maintain[ing] the existence and records of the Funds; (2) maintain[ing] the registrations and qualifications of Fund shares under federal and state law; (3) monitor[ing] the financial, accounting, and administrative functions of the Fund; (4) maintain[ing] liaison with the various agents employed by the Fund (including the Fund's transfer agent, custodian, independent

---

[1] The (i) T. Rowe Price Blue Chip Growth Fund, (ii) T. Rowe Price Capital Appreciation Fund, (iii) T. Rowe Price Equity Income Fund, (iv) T. Rowe Price Growth Stock Fund, (v) T. Rowe Price International Stock Fund, (vi) T. Rowe Price High Yield Fund, (vii) T. Rowe Price New Income Fund, and (viii) T. Rowe Price Small Cap Stock Fund (collectively, the "Funds"). Compl. ¶ 1. Except for the International Stock Fund, which is a *series* of T. Rowe Price International Fund Inc., an open-end management investment company registered under the ICA, each Fund is an ICA-registered open-end management investment company. *Id.* ¶¶ 24-25.

[2] References to the Roy Declaration and exhibits are to the Declaration of Amy D. Roy in Support of Defendant's Motion to Dismiss, filed concurrently herewith.

[3] For sake of consistency and brevity, TRP cites to the Capital Appreciation Fund's ("CAF") IMA, prospectus, and semi-annual report ("SR") throughout the memorandum, though the language in the Funds' respective IMAs and public filings is substantially the same across the eight Funds.

accountants and legal counsel) and assist[ing] in the coordination of their activities on behalf of the Fund." *Id.* at 2. The Fund Prospectuses also describe certain services available to shareholders, including an automatic asset builder, a discount brokerage service, an exchange service, retirement plans, telephone services, and wire transfers, all of which are provided by affiliates of TRP but which TRP is responsible for developing, managing and coordinating as the Fund's adviser. *E.g.*, Roy Decl., Ex. B (CAF Prospectus), at 45, 48, 52, 54, 175. These services are all in addition to the inherent fact that TRP, as the Funds' sponsor and originator, provides the original capital and infrastructure necessary to launch, brand, and maintain the Funds – costs TRP does not bear when serving only as a sub-adviser.

For all these services, TRP receives a management fee that has two components: an individual fund fee and a group fee. *Id.* at 27. The individual fund fee is based on each Fund's particular characteristics; fees are different, for example, between equity funds, fixed income funds, and international funds. *See* Roy Decl., Ex. C (TRP Statement of Additional Information ("SAI")), at 158-62. The group fee "is designed to reflect the benefits of the shared resources of the Firm." Roy Decl., Ex. B (CAF Prospectus), at 27. The group fee schedule includes 18 breakpoints, meaning that across the funds in the TRP fund "family" subject to the group fee, the fee is "graduated, declining as the asset total rises, so shareholders benefit from the overall growth in mutual fund assets." *Id.*

*Sub-Advisory Services and Fees.* TRP also provides sub-advisory services to 24 funds identified in the Complaint (the "Sub-Advised Funds"). *See* Compl. ¶ 80. For each Sub-Advised Fund, TRP provides a strictly defined set of investment-related services that are a *subset* of the full range it provides to the Funds it sponsors. *Compare* Roy Decl., Ex. D (MML Blue Chip Growth Investment Sub-Advisory Agreement), at 2-4, *with* Roy Decl., Ex. E (TRP Blue Chip Growth SR), at 27-28, and Ex. C (SAI), at 18. Each Sub-Advised Fund is sponsored by its own investment adviser that provides the balance of advisory and management services, oversees the sub-advisers' performance, and bears the entrepreneurial risk of having branded the Sub-Advised Fund, in exchange for its own management fee. *See* Roy Decl., Ex. F (MML Blue Chip Growth Prospectus), at 94; Ex. G (MML Blue Chip Growth SAI), at B-3.

## C. Approval of IMAs and Fees by Statutorily Independent Directors

As required by the ICA and by SEC rules, the Funds' public disclosures detail the Board's thorough review and analysis of the Funds' investment management agreements. *See* Roy Decl., Ex. H (CAF SR), at 34-35. At least 75% of each Fund's Board members are statutorily independent of TRP and its affiliates, far exceeding the statutory requirement that a majority of the members of the governing board be disinterested. *See* 15 U.S.C. § 80a-10(b)(1); Roy Decl., Ex. B (CAF Prospectus), at 26; Roy Decl., Ex. C (SAI), at 17. All directors are highly qualified and experienced. *See* Roy Decl., Ex. C (SAI), at 17-20.

Over the course of each year, the independent directors amass and consider extensive information about the nature, extent, and quality of services TRP provides to the Funds; the Funds' investment performance; TRP's investment processes; the Funds' portfolio composition and portfolio trading practices, and other relevant information. Roy Decl., Ex. H (CAF SR), at 34-35. After carefully evaluating this and other information, the Board, including the independent directors, annually considers the approval of the Fund's IMAs. *Id*. Through independent legal counsel, the independent directors also send in-depth requests for further information relevant to contract renewal and receives extensive supplementary materials. *Id*. Importantly, the Board also reviews comparable fee and performance data supplied by two independent providers of mutual fund data, Lipper, Inc. and Morningstar, Inc. *Id*. at 34. As a part of its process, the Board "also consider[s] whether the [F]und[s] benefit[] under the fee levels set forth in the Advisory Contract from any economies of scale realized by" TRP. *Id*. After this rigorous "15(c) Process," the Board determined that "it was in the best interests of the fund and its shareholders for the Board to approve the continuation of the Advisory Contract (*including the fees to be charged for services thereunder*)." *Id*. at 35 (emphasis added).

# ARGUMENT

## I. THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER SECTION 36(b) OF THE ICA

### A. The Legal Standard for Pleading a Section 36(b) Claim Is Stringent

The liability standard of Section 36(b) is exacting: a plaintiff must plead and prove that

the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). That means a plaintiff must advance *plausible* allegations that fees are *beyond* the arm's length range. *See Iqbal*, 556 U.S. at 678. Courts do not sit as "rate regulators" or super-directors to determine whether fees are "fair" or "reasonable." *See Jones*, 611 F. App'x at 360.[4] Nor are they charged to decide what fee should have been negotiated. *Jones*, 559 U.S. at 352-53. The courts' job is exclusively to decide if disputed fees exceed the "outer bounds" of arm's length bargaining. *Jones*, 611 F. App'x. at 360.

Applying these well-settled principles, two circuit courts recently affirmed the rejection of claims like those plaintiffs press here. In *Turner*, the Ninth Circuit held that a valid claim under Section 36(b) cannot be supported by "inapt comparisons" to other funds' fees when the plaintiff has failed to allege a factual basis establishing comparability of the funds or services provided. 626 F. App'x at 717. Similarly, on remand in *Jones*, the Seventh Circuit affirmed the importance of *apt* comparisons to *peer funds' fees* instead of the court engaging in "rate regulation": Fees "produced by bargaining at other mutual-fund complexes . . . *tell[] us the bargaining range*." 611 F. App'x at 360-61 (emphasis added). A plaintiff must aver sufficient facts to permit the court to "identify the outer bounds of arm's length bargaining" *and* determine that the challenged fee exceeds those bounds. *Id*. at 360. The Central District of Illinois also recently heeded these precepts, dismissing a claim against State Farm Investment Management Corporation where the plaintiff did not sufficiently allege that the investment adviser's charges on top of what it paid sub-advisers exceeded the fair bargaining range. *Ingenhutt v. State Farm Inv. Mgmt. Corp.*, No. 1:15-cv-01303, slip op. at 7-8 (C.D. Ill. June 22, 2016) (copy attached hereto as Roy Decl., Ex. I).

"[A]ll relevant circumstances [are to] be taken into account" when gauging whether the beyond-arm's-length standard is met. *Jones*, 559 U.S. at 347 (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)). Such circumstances may consist of a non-

---

[4] Unpublished Ninth Circuit decisions are persuasive authority "if issued on or after January 1, 2007." *See* Ninth Cir. R. 36-3(b).

exhaustive list of factors set forth in *Gartenberg* and approved by the Supreme Court in *Jones*, *id.* at 344 n.5, known as "*Gartenberg* factors."[5]  Importantly, though the *Gartenberg* factors inform the Court's consideration, they are *not* the standard of liability or elements that must be satisfied to establish a Section 36(b) claim.  A plaintiff cannot withstand dismissal simply by asserting rote allegations about any one "factor," or even all of them.  Instead, a pleading must plausibly connect the dots between the factual allegations about a "factor" and its *effect* on the challenged fee.  *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001). Nonconclusory allegations about any factor must push the fee outside of the "bargaining range" to establish liability, and the alleged details about any factor must be tied to the challenged fee to show a plausible inference that the fee is "so disproportionately large" that it "could not have been" negotiated at arm's length.  *See Jones*, 559 U.S. at 346; *Turner*, 626 F. App'x at 716-17.

**B.    Plaintiffs' Conclusory and Unsupported Allegations Regarding TRP's Sub-Advisory Services Provide No Basis to Conclude that TRP's Advisory Fee to the Funds Could Not Have Been Negotiated at Arm's Length**

Plaintiffs' allegations fail as a matter of law because the Complaint avers no facts from which to discern *any* bargaining range for the Funds' advisory fees.  Fees charged by comparable mutual funds "tell[] us the bargaining range." *Jones*, 611 F. App'x at 361.  The Complaint does not allege what comparable funds charge for services of the type provided by TRP, or how those fees compare to TRP's fees.  Instead, to manufacture a bargaining range of their own, plaintiffs cherry-pick twenty-four mutual funds for which TRP provides *sub*-advisory services and attempt to compare TRP's *sub-advisory* fees to the *advisory* fees it charges to the eight Funds.  But comparisons to fees charged to other clients for providing a different and more narrow set of services are "inapt comparisons." *Jones*, 559 U.S. at 350.  And the Complaint omits any facts

---

[5] Those factors include "(1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any 'fall-out financial benefits,' those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation." *Jones*, 559 U.S. at 345 n.5 (quoting *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 929-32 (2d Cir. 1982)).

establishing a predicate for comparability. Indeed, in *Turner*, the Ninth Circuit refused to accept at face value allegations that "comparator" funds referenced in the complaint were actually comparable. Likewise, because the plaintiff in *Turner* did not plausibly allege "that these other funds' advisers provided the same services or pursued a similar investment strategy . . . these juxtapositions len[t] no support" and dismissal was appropriate. 626 F. App'x at 717.

The same analysis applies to plaintiffs' fee comparisons here. Instead of comparing the Funds' advisory fees to competitor funds' advisory fees, the Complaint offers up only plaintiffs' say-so: the pleading blithely avers that, in its role as primary sponsor and adviser to mutual funds, and as sub-adviser to funds sponsored by other complexes, TRP performs "the same or substantially the same services." Compl. ¶ 88. That allegation, like the inapt comparisons in *Turner*, is too conclusory to be credited and is belied by the public record referenced in the Complaint.

The Funds' public filings and the public filings of the Sub-Advised Funds illustrate that the management fees charged to the Funds are, with minimal exceptions, *less* than the management fee charged to the Sub-Advised Funds. Mutual funds like the TRP Funds are required by law to disclose fees in a manner that permits "comparison shopping" by investors. 17 C.F.R § 239.15A. Accordingly, they publish "fee tables" in prospectuses that disclose management fees and other expenses and reveal funds' investment performance compared to benchmarks. *See* Roy Decl., Ex. B (CAF Prospectus), at 1. Those fee tables permit an apt comparison by showing how the Funds' advisory fees stack up to the full advisory fees paid by the Sub-Advised Funds for the services of both the adviser and the sub-adviser. Condensing the management fees from those tables into one chart clearly demonstrates that the Funds' management fees are not only within the "bargaining range"[6] but are actually almost all *below* the

---

[6] The public record also shows that the Board considered independent data regarding peer funds' fees and expenses and concluded that TRP's advisory fees were easily *within* that range. *See*, *e.g.*, Roy Decl., Ex. H (CAF SR), at 34-35 (describing the Board's comparison review of the Funds' fees and expenses to those of comparable peer funds based on data supplied by Lipper). And according to Morningstar – a well-respected industry analyst – all eight advised Funds' expenses were at least 13 basis points lower than the mean and median expenses for their relevant

(Footnote continues on next page.)

corresponding advisory fee of competitors identified by plaintiffs in virtually every instance:

| 1. TRP Advised Fund | 2. Fund's Mgmt Fee to TRP | 3. Sub-Advised Fund | 4. Sub-Advisory Fee to TRP | 5. Sub-Advised Fund's Total Mgmt Fee | 6. Differential between Mgmt Fees |
|---|---|---|---|---|---|
| Blue Chip Growth Fund | 0.57% | MassMutual Select Blue Chip Growth Fund | 0.335% | 0.630% | 0.060% |
| | | VALIC Company I - Blue Chip Growth Fund | 0.35%-0.40% | 0.730% | 0.160% |
| | | MML Blue Chip Growth Fund | 0.335% | 0.750% | 0.180% |
| Capital Appreciation Fund | 0.59% | VY T. Rowe Price Capital Appreciation Portfolio | 0.350% | 0.640% | 0.050% |
| | | JNL/T. Rowe Price Capital Appreciation Fund | 0.350% | 0.700% | 0.110% |
| | | Allianz Variable Insurance Products Trust - AZL T. Rowe Price Capital Appreciation Fund | 0.350% | 0.750% | 0.16% |
| Growth Stock Fund | 0.52% | Metropolitan Series Fund - T. Rowe Price Large Cap Growth Portfolio | 0.325%-0.35% | 0.6% | 0.080% |
| | | JNL/T. Rowe Price Established Growth Fund | 0.325%-0.35% | 0.55%-0.65% | 0.03%-0.13% |
| | | LVIP T. Rowe Price Growth Stock Fund | 0.390% | 0.670% | 0.150% |
| | | VY T. Rowe Price Growth Equity Fund | 0.325%-0.35% | 0.700% | 0.180% |
| | | Penn Series Funds, Inc. - Penn Series Large Growth Stock Fund | 0.325%-0.35% | 0.710% | 0.190% |
| | | Optimum Fund Trust - Optimum Large Cap Growth Fund | 0.35%-0.40% | 0.740% | 0.220% |
| | | EQ/T. Rowe Price Growth Stock Portfolio | 0.35% | 0.750% | 0.230% |
| | | Thrivent Series Fund, Inc. - Thrivent Partner Growth Stock Portfolio | 0.35%-0.40% | 0.800% | 0.280% |
| | | Season Series Trust - Stock | 0.325%-0.35% | 0.840% | 0.320% |
| Small Cap Stock Fund | 0.74% | VALIC Co I - Small Cap Fund | 0.55%-0.60% | 0.880% | 0.140% |
| International Stock Fund | 0.64% | Voya Investor Trust - VY T. Rowe Price International Stock Portfolio | 0.425% | 0.640% | 0.000% |
| Equity Income Fund | 0.52% | Vantagepoint Funds - Equity Income Fund | 0.300% | 0.400% | -0.120% |
| | | Great West Funds, Inc - Great-West T. Rowe Price Equity Income Fund Portfolio | 0.300% | 0.450% | -0.070% |
| | | VY(R) T. Rowe Price Equity Income Portfolio | 0.300% | 0.640% | 0.120% |
| | | MainStay VP Funds Trust - MainStay VP T. Rowe Price Equity Income Portfolio | 0.300% | 0.725%-0.75% | 0.205%-0.23% |
| | | MML Equity Income Fund | 0.300% | 0.750% | 0.230% |
| New Income Fund | 0.44% | John Hancock Variable Insurance Trust - New Income Trust | 0.140% | 0.550% | 0.110% |
| High Yield Fund | 0.59% | Penn Series Fund - Penn Series High Yield Bond Fund | 0.400% | 0.560% | -0.030% |

The total management fee paid by the Sub-Advised Funds, reflected in Column 5 above, is key to assessing the correct "bargaining range," yet plaintiffs deliberately exclude that data.

(Footnote continued from previous page.)

comparator funds. Roy Decl., Exs. J1-J8 (Morningstar, Inc. "Expense" Ratings, *available at* http://financials.morningstar.com/ (last visited June 30, 2016)). As discussed in TRP's Request for Judicial Notice, the Court may take notice of published Morningstar material.

Simply put, plaintiffs are comparing the Funds' *advisory* fees (Column 2) to the Sub-Advised Funds' *sub-advisory fees* (Column 4), rather than comparing the Funds' *advisory* fees (Column 2) to the Sub-Advised Funds' *advisory* fees (Column 5). Their motive is transparent – by excluding Column 5, plaintiffs create the illusion that TRP's management fees charged to the Funds are less than the management fees charged to the Sub-Advised Funds. But this is not true, and plaintiffs' assertion otherwise does not make it so. In fact, the Funds' prospectuses reveal that TRP's management fees for the Funds are *lower* than those charged by third-party investment advisers to the Sub-Advised Funds in nearly every instance.[7]

The same deceptive omission forms the basis for plaintiffs' allegation that the services TRP performs for the respective fees are "the same or substantially the same" for the Funds and Sub-Advised Funds. Plaintiffs disregard the publicly available record and ignore that each of the twenty-four Sub-Advised Funds has its own primary adviser that receives an additional fee on top of TRP's sub-advisory fee for the additional services those advisers provide to the respective Sub-Advised Funds. For example, the MML Blue Chip Growth Prospectus and SAI describe the additional advisory services MML Investment Advisers, LLC provides to the fund in addition to TRP's sub-advisory services, including the hiring and oversight of sub-advisers, board reporting, assistance in the 15(c) process, and advice and recommendations to the Trustees relating to the fund's investment objective, strategies, policies, and valuation. Roy Decl., Ex. F (MML Blue Chip Growth Prospectus), at 94; Ex. G (MML Blue Chip Growth SAI), at B-3. Similarly, the TRP Funds' public disclosures reflect an even more robust set of responsibilities and risks borne by TRP – in addition to portfolio management – when serving as a Fund adviser, including: developing the investment product and assuming the business risk of whether it succeeds; maintaining the Funds' records and preparing all SEC filings; preparing and responding to shareholder communications, complying with a host of regulatory and legal obligations, as well as assuming related enforcement and litigation risk; reporting regularly to, and preparing

---

[7] In only three of the twenty-four instances were TRP's management fees higher than the other funds, and only by three, seven, and 12 basis points. *See supra*, table p. 9, column 6.

materials requested by the Board of Directors for the annual 15(c) approval process; oversight of third-party service providers like transfer agents and custodians; and providing personnel to serve as investment management personnel and fund officers.  *E.g.*, Roy Decl., Ex. H (CAF SR), at 34-35; Ex. C (SAI), at 18.  As sub-adviser, TRP provides virtually none of the above services.  Rather, TRP is responsible only for conducting portfolio research and selection, trade execution, and limited investment-related reporting and compliance assistance for the Sub-Advised Funds (for which primary advisers remain ultimately responsible).  *E.g.*, Roy Decl., Ex. D (MML Blue Chip Growth Inv. Sub-Advisory Agreement), at 2-3.  The distribution of responsibilities between adviser and sub-adviser can be summarized as follows:

| TRP Advised Funds | Sub-Advised Funds | |
|---|---|---|
| **Adviser (TRP)** | **Primary Adviser (MassMutual, Allianz, John Hancock, etc.)** | **Sub-Adviser (TRP)** |
| • SEC filings<br>• Shareholder communications<br>• Regulatory/legal compliance<br>• 15(c) process<br>• Third-party service provider oversight<br>• Fund officers & facilities<br>• Portfolio research & selection<br>• Portfolio trade execution<br>• Proxy voting | • SEC filings<br>• Shareholder communication<br>• Regulatory/legal compliance<br>• 15(c) process<br>• Third-party service provider oversight<br>• Fund officers & facilities | • Portfolio research & selection<br>• Portfolio  trade execution<br>• Proxy voting |

These service descriptions, considered along with the fee comparisons in the chart above, put the lie to plaintiffs' fundamental contention that the services TRP performs for the Funds and Sub-Advised Funds are "the same or substantially the same."  Plaintiffs' effort to equate the fraction of the total services TRP provides to the Sub-Advised Funds with the full suite of services it provides to the Funds is accordingly not plausible, and as a result the comparison is not a sufficient basis for alleging a violation of Section 36(b).[8]  By omitting crucial information from

---

[8] Further, even if TRP provided the same set of services to the Funds and the Sub-Advised Funds, which it does not, this would not be enough to state a Section 36(b) claim.  The *Jones* Court cautioned that Section 36(b) does not require "fee parity" among all clients and funds.  559 U.S. at 350.  Allegations of a lack of "fee parity" by themselves do not state a plausible claim that the Funds' advisory fees are "so disproportionately large" that they *could not* have been negotiated at arm's length.  *Id.* at 346.  Indeed, the Court instructed that a trial will be warranted "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the
(Footnote continues on next page.)

their Complaint and providing instead a misleading illustration of comparative fees, plaintiffs allege nothing about the actual "bargaining range" for the challenged fees. When TRP's fees are subjected to an apt comparison to the management fees for the Sub-Advised Funds, it is clear that plaintiffs simply cannot make a plausible claim that TRP's fees are *beyond* what "*could*" be bargained for at arm's length. Dismissal is therefore warranted on this basis alone.

### C. Conclusory Allegations About Presumed Economies of Scale Do Not Plausibly Allege that the Fees Were Outside an Arm's-Length Bargaining Range

As in *Turner*, the Complaint's allegations that TRP achieved economies of scale but did not pass them along to the Funds' shareholders are entirely conclusory and built on an unfounded assumption that economies of scale must be realized whenever assets under management ("AUM") grow. *See* 626 F. App'x at 717. Plaintiffs simply assert that "[t]he increase in investment management fees . . . was not accompanied by a proportionate increase in the work required by or cost to Defendant" to provide investment management services, Compl. ¶ 164, and that the fees charged do not allow the Funds to "benefit[] from economies of scale," *id.* ¶¶ 168, 172. But those same conclusory allegations were not credited in *Turner*,[9] have been rejected by a number of other courts,[10] and should not be credited here.

First, plaintiffs do not plead sufficient facts that economies of scale actually existed. They simply claim that TRP "realized economies of scale as the Funds' AUM increased, which reduced the cost" of providing services on a percentage-of-AUM basis and thus "increased [TRP's] profitability . . . ." Compl. ¶ 163. Plaintiffs offer no factual support for this conclusion, other than statistics about the AUM and effective investment management fee rates and naked hypotheses that increases in AUM during that period "produced benefits to Defendant." *See, e.g.*,

(Footnote continued from previous page.)
different services *in addition to other evidence that the fee is outside the arm's-length range*." *Id.* at 350 n.8 (emphasis added).

[9] The allegations in *Turner* are strikingly similar. Roy Decl., Ex. K (Am. Compl. ¶¶ 229, 241, *Turner v. Davis Selected Advisers, LP*, No. 08-cv-00421 (D. Ariz. Apr. 23, 2009), ECF No. 33) ("*Turner* Compl.").

[10] *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ.1921 (DAB), 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990).

*id.* ¶¶, 185, 189, 193, 197, 211. But courts have rejected as "insufficient" plaintiffs' "[m]ere allegations that the fund was 'large' and that there were economies of scale to be realized." *Turner v. Davis Selected Advisers, LP*, No. 08-cv-00421-TUC-AWT, 2011 WL 13070408, at *9 (D. Ariz. June 1, 2011) (Tashima, J., sitting by designation); *Kalish*, 742 F. Supp. at 1238.

Second, plaintiffs do not allege that TRP failed to share potential economies of scale with the Funds' shareholders. *See In re Am. Mut. Funds Fee Litig.*, No. CV-04-5593-GAF-(RNBx), 2009 WL 5215755, at *51 (C.D. Cal. Dec. 28, 2009). Nor could they; TRP employs a regime of breakpoints specifically designed to appropriately share the benefits of economies of scale with all of the Funds. The "group fee," calculated on the combined AUM of all TRP funds,[11] contains 18 breakpoints and applies to each of the Funds at issue here. Compl. ¶¶ 73-74. The "individual fund fee," by contrast, is calculated as a percentage of each individual fund's AUM and contains breakpoints for four of the eight Funds. *Id.* ¶¶ 76-77. Importantly, the four Funds without *individual* breakpoints still experience decreases to management fee rates based on breakpoints contained in the *group fee* schedule. *Id.* ¶ 180. Thus, each of the Funds benefits whenever the Board approves – as it did in 2015 – additional breakpoints to the group fee schedule. *See* Roy Decl., Ex. H (CAF SR), at 34 (approving 0.005% breakpoint to the group fee schedule).

Despite TRP's breakpoints, plaintiffs critique the group and individual fees for not having breakpoints at plaintiffs' desired AUM levels. But fatal to plaintiffs' Complaint is its failure to provide "any facts to show that these breakpoints are inadequate means of giving the shareholders benefits of economies of scale." *Turner*, 2011 WL 13070408 at *9. Plaintiffs' contentions do not "make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew." *See Hoffman*, 591 F. Supp. 2d at 540. Thus, when the Board expressly considered economies of scale in its IMA approval process – as the Board indisputably did here[12] – deference to the independent

---

[11] A few funds are excluded from this calculation, such as certain index funds, cash sweep vehicles, and funds-of-funds.

[12] *See, e.g.*, Roy Decl., Ex. H (CAF SR), at 34 (reporting the Board's recent conclusion that "the advisory fee structure for the fund continued to provide for a reasonable sharing of benefits from any economies of scale with the fund's investors.").

directors' judgment must be given.  *See Jones*, 559 U.S. at 351.

### D.    Plaintiffs' Allegations Regarding Board Independence, Expertise, Care, and Conscientiousness are Deficient and Contradicted By the Public Record

Case law and the public record also compel rejection of plaintiffs' unsubstantiated generalization that the Board "approved the IMAs each year without devoting the time and attention necessary to independently assess the investment management fee rate paid by each Fund or to effectively represent the interests of [the] Fund…."  Compl. ¶ 229.  Courts have routinely rejected similar conclusory allegations that a board rubberstamped the investment management agreement and advisory fees.  *See, e.g.*, *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 563 (D.N.J. 1999) (collecting cases).  A plaintiff must do more than allege bald "generalities" about "the frequency with which and amount of time the directors meet throughout the year," especially when publicly available 15(c) process disclosures convey otherwise.  *See Turner*, 2011 WL 13070408, at *10.  Nor is it sufficient to argue that the fee approval process *must have* been flawed because the directors have other professional responsibilities (Compl. ¶ 230), *see Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006), or relied on materials prepared by the adviser (Compl. ¶ 232) – a duty expressly contemplated by the ICA as belonging to the adviser.  *See Migdal*, 248 F.3d at 331.  As in *Turner*, plaintiffs' circular reasoning – that the Board *must have lacked* independence, conscientiousness, and adequate information *because* TRP charged "excessive" fees – must be rejected.  626 F. App'x at 716.

The public record of the Board's thorough review and analysis of the Funds' IMAs, *see supra* p. 5, belies any assertion that the Board did not exercise independence or conscientiousness in approving TRP's fees.  Not only did the Board consider all *Gartenberg* factors, the Funds' performance record, and comparisons of the Funds' performance to those of a universe of peer funds, it also considered and ultimately approved a new breakpoint to the group fee schedule in 2015.  *See, e.g.*, Roy Decl., Ex. H (CAF SR), at 34-35.  The combination of the Board's robust review process and the lack of factual allegations identifying anything specific about the purported defects in the Board's process command that deference be given to the independent

directors' decision to approve the Funds' advisory fees. *Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process."

## II.    SECTION 47 PROVIDES NO SEPARATE BASIS FOR A CLAIM

Because they failed to state a plausible claim under Section 36(b), plaintiffs are not entitled to relief under Section 47(b), which authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter." 15 U.S.C. § 80a-46(b)(1).  Additionally, plaintiffs lack standing to seek the IMAs' rescission because the plain language of Section 46(b) makes rescission available only to a "party" to that contract – in this case, TRP and the Funds. *Id.*; *Turner*, 2011 WL 13070408, at *10-11 (granting motion to dismiss Section 47(b) claim for lack of standing); *see also Davis v. Bailey*, No. CIVA05-cv-0042 WYD-OES, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (similar).[13]

### CONCLUSION

For the foregoing reasons, plaintiffs' Complaint should be dismissed with prejudice.

_____

[13] Plaintiffs' jury trial demand should also be rejected, as courts routinely hold that Section 36(b) claims are equitable in nature and therefore do not fall within the Seventh Amendment's right to jury trial. *See e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) (plaintiff not entitled to jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line), *rev'd on other grounds*, 500 U.S. 90 (1991); *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) (same); *In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) (same). Accordingly, plaintiffs' jury demand should be stricken. *See Zehrer v. Harbor Capital Advisors, Inc.*, No. 14 C 789, 2014 WL 6478054, at *5 (N.D. Ill. Nov. 18, 2014) (striking plaintiff's jury trial demand at motion to dismiss stage).